819 P.2d 1306

**ECONOMY RENTALS, INC., Plaintiff–Counterdefendant–Appellant,**

v.

**Sheilah P. GARCIA, individually and as Personal Representative of the Estate of Julian N. Garcia, Deceased, Defendant–Counterclaimant–Crossclaimant–Appellee,**

v.

**AMERICAN TOYOTA, INC., and Beatriz Rivera, Defendants–Crossdefendants–Appellants.**

**Nos. 19135, 19136.**

Supreme Court of New Mexico.

Sept. 24, 1991.

Rehearings Denied Oct. 21 and Nov. 21, 1991.

Paul A. Phillips, Albuquerque, for appellant Economy Rentals.

Kemp, Smith, Duncan & Hammond, John P. Eastham, Albuquerque, for appellants American Toyota and Rivera.

The Poole Law Firm, Jason W. Kent, Alma Reyes, Albuquerque, for appellee Garcia.

OPINION

MONTGOMERY, Justice.

The principal issue on this appeal is whether Economy Rentals, Inc., a lessor of real property in Albuquerque, New Mexico, breached its lease by unreasonably withholding consent to its lessee's request for approval of a sublease and then terminating the lease when the lessee failed to cure an alleged default. Resolution of this issue requires us to articulate standards for a determination of what constitutes "reasonable" grounds for withholding consent to a lessee's proposed assignment or sublease. We hold that the trial court properly determined that the lessor's refusal to consent was unreasonable.

This resolution does not, however, dispose of this appeal. Several issues relating to the relief afforded the lessee by the trial court for the lessor's breach, and for the sublessee's concomitant breach of its obligations under the sublease, are raised by the appellants, including issues relating to the compensatory damages awarded the lessee against both the lessor and the sublessee and whether those parties could properly be held "jointly and severally" liable for those damages. In the course of our opinion, we also discuss issues relating to prejudgment interest, punitive damages, and determination of attorney's fees, along with certain other issues of which we dispose summarily. We affirm in part, reverse in part, and remand for further proceedings.

I. *Facts and Issues*

Effective April 1, 1977, Julian Garcia, an automobile dealer in Albuquerque, leased from Economy Rentals, Inc. ("Economy"), certain premises at 725 Wyoming Boulevard, N.E. (the "Economy property"), for a ten-year period at an escalating rent, reaching $3,000 per month from April 1982 through March 1987. Although effective in April 1977, the lease was not actually signed by Economy and Garcia until June 14, 1979. Contemporaneously with execu-

ting the lease, the parties also executed an "amendment" to the document, under which the lessee could not assign or sublet the premises without the written consent of the lessor, "which consent shall not be unreasonably withheld."

When the lease became effective and for some time before, the Economy property was occupied by American Toyota, Inc. ("American"). American had been formed in 1976 to enable Garcia to acquire a second automobile franchise from Toyota Motors; at that time Garcia already owned and operated another Toyota dealership in Albuquerque. Initially, Garcia owned 90% of the stock in American; the remaining 10% was owned by his cousin, Beatriz Rivera, who was named president and general manager. Pursuant to Toyota Motors' requirement, Rivera also held an option to acquire sufficient additional stock to become the majority stockholder.

Garcia had first acquired a lease on the Economy property in 1976 by assignment (with Economy's consent) from the previous tenant and had placed American in possession under an oral sublease at that time. Thus, when Economy and Garcia executed the new ten-year lease in 1979, American had been occupying the Economy property for at least two years, with Economy's full knowledge and consent. The parties confirmed this arrangement in writing when the lease and the amendment were executed, with Economy consenting to the subleasing of the premises to American on the understanding that Garcia was not relieved of his obligations under the lease.

In 1983 a dispute arose between Rivera and Garcia over Rivera's option to acquire control of American. The dispute apparently was protracted and bitter.[1] It was finally resolved in May 1984 by execution of a series of documents under which Rivera, through American, purchased all of Garcia's stock in American and thereby acquired full ownership of the corporation, and under which Garcia conveyed to American his interest in the Economy leasehold and a related leasehold of adjoining property to the south.[2] This conveyance was effected through a document entitled "Grant of Leaseholds," which provided for American to have possession of each of the two leased tracts for a period of twenty months from May 2, 1984, to December 31, 1985, with the right to extend its possessory interests for not more than an additional six months to June 30, 1986.[3] In exchange

1. In connection with the parties' efforts to resolve the dispute, American and Rivera in June of 1983 submitted to Garcia a proposed assignment of Garcia's interest in the Economy lease, consented to by Economy. However, Garcia refused to execute this assignment and subsequently notified Rivera that the rent on the oral sublease would be increased. The dispute continued, with Garcia terminating American's oral sublease in March 1984. Shortly thereafter, the dispute was resolved by execution of the documents described in the text.

2. This related leasehold on the south existed by virtue of another lease to Garcia from the owners of the premises at 707 Wyoming Boulevard, N.E., Mr. and Mrs. Rogers (the "Rogers property"). Garcia had leased the Rogers property in 1976 for approximately a ten-year period (expiring simultaneously with the Economy lease on April 1, 1987) for $540 per month. American's Toyota dealership occupied both the Economy property and the adjoining Rogers property.

3. The parties disagree over the proper characterization of this "Grant of Leaseholds"—*i.e.*, whether it was a transfer of the Garcias' leasehold rights in exchange for the "business loan" reflected in the promissory notes, or whether it was a sublease of the premises with the rent payable as stipulated in the promissory notes. The trial court held that the document created a sublease, and we think this was clearly correct. Since the Garcias transferred less than their entire leasehold interest in each property, by granting American the right to possession for less than the full term of the primary lease, the transfer was a sublease, not an assignment. *See* R. Schoshinski, *American Law of Landlord and Tenant* § 8.11 (1980). The consideration for the transfer was the first promissory note (for $157,500), which was payable in installments, the first installment being $15,000 and each of the remaining nineteen installments being $7,500, for the duration of the initial twenty-month period of the grant. The installment payments did not bear interest. The "Grant of Leaseholds" provided for an extension of the leasehold estate for up to six months for an additional price equal to $7,500 times the number of months of the extension, the additional price also payable in monthly installments of

for this transfer of the right to possession, American obligated itself to pay $7,500 per month, with a bonus of an additional $7,500 for the first month, for the period in which it had the right to possession, including any extension. This obligation was represented by a promissory note and provision for another note to cover the extension period. Rivera endorsed both notes as personal guarantor.

The document by which American acquired the Garcias' stock in the corporation, and which outlined the terms of the overall transaction through which the Rivera–Garcia dispute was settled in May 1984, and to which the "Grant of Leaseholds" was an exhibit, was an agreement called the "buy-sell agreement." This document contained various provisions relating to the transaction—setting forth the terms of the promissory notes, describing the Grant of Leaseholds, establishing an escrow, providing for mutual releases, and so forth—most of which are not material to this lawsuit. One paragraph of the buy-sell agreement, however, warranted that American would pay all rents due to the lessors under the Economy and Rogers leases "and will continue to perform all such other obligations of Lessee [Garcia] as are set forth in said leases as it has performed said obligations in the past." American had always paid the monthly rent (by then $3,000) to Economy under the Economy lease, as well as the $540 per month rent to Rogers under the Rogers lease. The same paragraph also warranted that American and Rivera would not compete with the Garcias if the Garcias attempted to lease or purchase at some future time the properties on which American was currently doing business. American also warranted that at the end of the sublease it would assign to the Garcias any interest it might have in a lease with the

owner of a third parcel of land, called the "Janpol property," adjoining the Economy property on the north.

Several months after the May 1984 transaction had closed, Rivera advised Economy that she had become the sole stockholder of American and had obtained a written sublease of the property. Economy apparently then reviewed the Grant of Leaseholds and the buy-sell agreement and notified Garcia on November 2, 1984, that the sublease agreement constituted a breach of the primary lease since it had been entered into without Economy's consent. Three weeks before this notification, Julian Garcia died, survived by his wife and sole beneficiary of his estate, Sheilah Garcia.[4]

Sheilah Garcia responded to the notification, stating that Economy's previous written consent to American as sublessee was still effective, but also asking Economy to reconfirm that consent. Economy refused, without giving any specific reason for its nonconsent at that time. Whether the three reasons ultimately advanced by Economy at trial were reasonable bases for refusing consent is discussed below. Meanwhile, Economy and Garcia remained at loggerheads, and in February 1985 Economy advised Garcia and Rivera that the attempted sublease constituted a breach of the lease and gave Garcia thirty days to cure the alleged default. Garcia insisted that she was not in default; however, on March 13, 1985, Economy declared the lease terminated and informed American that it was in possession of the property as a tenant at sufferance.

One month later, on April 19, 1985, Economy instituted the present action by suing Garcia, American, and Rivera for a declaratory judgment that the lease had been properly terminated. Garcia counterclaimed for a declaration that the termi-

---

$7,500 each, without interest. The substance of the transaction was clearly to confer on American the Garcias' right to possession under the Economy lease; as such (and not being an assignment), it was a sublease. The parties' briefs do not explain why the transaction was structured in this particular way.

**4.** References in this opinion to "Garcia" are either to Julian, before his death on October 11, 1984, or to Sheilah thereafter, as the context may require.

nation was wrongful and crossclaimed for damages from American and Rivera. In June 1986 Garcia amended and supplemented her answer, counterclaim, and crossclaim, seeking damages from Economy as well as American and Rivera. Shortly thereafter, Garcia filed her own action against American and Rivera in an attempt to evict American from the Rogers property and to obtain damages for American's continued occupancy of that property. The two suits were consolidated in April 1988, by which time American had long since vacated both properties and Garcia no longer claimed a right to possession beyond the April 1, 1987, termination date of the original lease.

Meanwhile, after Economy declared the lease terminated in March 1985, American established an escrow account with a local bank, into which it deposited the installment payments due under the promissory notes provided for in the buy-sell agreement as consideration for the Grant of Leaseholds. American expressed concern that it might be exposed to double liability to both Economy and Garcia, so it notified Garcia that she could withdraw the funds on deposit by obtaining Economy's written consent to the sublease. American continued to make the $7,500 monthly payments into the escrow account until June 1986. By then it had deposited a total of $112,500, representing the installments due for the fifteen months (from April 1985 to June 1986) after Economy's purported termination of the lease. During this period, American paid both the primary lease rental of $3,000 per month to Economy and the sublease rental of $7,500 per month to the escrow agent. In July and August 1986, American and Rivera withdrew the funds on deposit and then closed the escrow account.

After expiration of the agreed term of the sublease as provided in the Grant of Leaseholds, American continued to occupy the Economy property under a lease negotiated directly with Economy for the nine-month period beginning July 1, 1986, and ending March 31, 1987. The rent on this lease was $7,000 per month, which American paid directly to Economy. American vacated the Property on March 31, 1987; Garcia was then in the process of locating her businesses elsewhere. Thus, after April 1, 1987, when the Economy–Garcia lease expired and neither Garcia nor American was claiming a right to possession, the only issues remaining among the parties were determination of Garcia's claims for damages against Economy and American/Rivera.

A bench trial of the consolidated actions [5] was conducted in two sessions over six days in November 1988 and August 1989. The court rendered its decision in September 1989, holding generally in favor of Garcia and against both Economy and American/Rivera. The court determined that Economy and American/Rivera were each jointly and severally liable for Garcia's total damages of $271,125, of which $180,000 ($7,500 × 24 months) represented unpaid sublease rent and $91,125 represented prejudgment interest. Prejudgment interest was calculated at the statutory rate of 15 percent annually [6] for each unpaid sublease payment for the period in which the installment was unpaid to the time of trial. The court also awarded punitive damages of $5,000 against Economy and $50,000 against American. In addition to these amounts, the court awarded attorney's fees of $73,000 against American, representing the fees which the court found Garcia had incurred in recovering on the promissory notes, which provided for attorney's fees in the event of default. Rivera, as American's guarantor, was held liable for all amounts awarded against American except the $50,000 punitive damages.

On appeal, Economy and American first join forces to argue that Economy's termi-

---

5. Garcia's claims in the second action, involving her claimed right to possession of the Rogers property, were moot at this point.

6. Under NMSA 1978, § 56–8–3 (Repl. Pamp. 1986).

nation of the lease was permissible because Economy reasonably withheld consent to the sublease. At first blush, it is not entirely clear why American takes this position, since it acknowledges liability to Garcia in any event for the delinquent $112,500 in promissory note installments from April 1985 to June 1986. American asserts in its brief, and took the position in its requested findings below, that it had always stood ready, willing and able to pay the $112,500 to Garcia if only she would obtain consent to the sublease. On consideration of the period after June 30, 1986, however, it becomes clearer why American claims that Economy properly terminated the lease: If Economy's grounds for refusing consent were unreasonable and its termination of the lease therefore wrongful, the lease remained in effect until April 1, 1987; and, since American's sublease ended on June 31, 1986 (after the six-month extension) but American remained in possession, American was a holdover subtenant and therefore arguably liable for the sublease rent from July 1, 1986, to March 31, 1987.

Economy also urges on appeal that, even if this Court should hold that its termination of the lease was wrongful, there is no basis for the trial court's holding Economy jointly and severally liable for the same damages as those assessed against American.

Both appellants attack the trial court's awards of prejudgment interest and punitive damages, asserting that the promissory notes to Garcia did not provide for interest and that there was no substantial evidence to support the court's findings that Economy's breach of the lease and American's breach of the sublease were willful, in bad faith, and in reckless disregard of Garcia's rights. Additionally, American challenges the trial court's award of attorney's fees, contending that the court's determination of $73,000 as the amount incurred for enforcing the promissory notes was arbitrary, unsupported by substantial evidence, and not based on the applicable law governing an award of attorney's fees.

Both appellants also claim that the trial judge should have recused himself for reasons set out later in this opinion. In addition to this point, American asserts as errors the court's admission of certain evidence and its refusal to rule that the Garcias' unexecuted assignment of the lease in 1983 divested them of any further interest in the property. These issues will be considered summarily toward the end of this opinion.

We turn first to the question whether Economy unreasonably withheld consent to the 1984 Grant of Leaseholds.

## II. *Breach*

Economy's claimed reasons for withholding consent were based on the fact that the sublease ended on June 30, 1986—nine months before the prime lease terminated on April 1, 1987—and on two provisions in the buy-sell agreement: the provision obligating American to refrain from competing with Garcia if the latter attempted to lease or purchase either the Economy property or the Rogers property and the provision requiring American to assign to Garcia at the end of the sublease any interest it might have in the adjoining Janpol property. We shall consider the reasonableness of these objections to the terms of the sublease shortly; first, we examine the law in New Mexico on the subject, with an eye toward any standards of reasonableness it may provide.

In *Boss Barbara, Inc. v. Newbill,* 97 N.M. 239, 638 P.2d 1084 (1982), this Court first considered a lease provision obligating the tenant not to assign or sublease the leased premises without the landlord's consent. We held, following the minority rule in this country, that even though the lease might not require the landlord's reasons for withholding consent to be reasonable, such a requirement would be read into the lease as part of each party's obligation to deal with the other in good faith and in a commercially reasonable manner. *See id.* at 241, 638 P.2d at 1086. The landlord in

that case admitted that the proposed sub-tenant was commercially reasonable and no other reason for the landlord's refusal to consent to the sublease appears in the opinion. We did not articulate any standard of reasonableness except to say, in dictum, that "consent is not to be withheld unless the prospective tenant is unacceptable, using the same standards applied in the acceptance of the original tenant." *Id.*

Shortly after deciding *Boss Barbara,* we issued our opinion in *Cowan v. Chalamidas,* 98 N.M. 14, 644 P.2d 528 (1982). As in *Boss Barbara,* we held in *Cowan* that the lessor's withholding of consent to a transfer of the lessee's leasehold interest (there, a proposed assignment) was unreasonable. In *Cowan,* the lease expressly provided that the lessor's consent should not be unreasonably withheld, and we reiterated that consent was not to be withheld unless the prospective tenant was unacceptable under the standards applied in entering into the original lease. *Id.* at 17, 644 P.2d at 531. Although in *Cowan* the lessor claimed that the proposed assignees were financially unstable, we noted that the lessor directly leased the premises to the same "unstable" party within one week of the lessee's abandonment of the premises. Accordingly, the case stands as authority for the proposition that if a claimed reason for refusing consent is merely pretextual, the court will look through the asserted reason to the true motivation and assess the reasonableness of that motivation in light of the facts in the case.

Economy earnestly contends that its claimed reasons for refusing consent were reasonable. It argues that the termination date in the "Grant of Leaseholds" presented it with the very real possibility that American would vacate the premises nine months before the prime lease was to expire, with the result that the property almost certainly would have ceased being used as the site for a new-car dealership. The premises had always (since before the lease began in April 1977) been used for that purpose, and the lease itself provided that "[t]he premises are rented for an automobile showroom, sales and service facility." Economy maintains that it derived maximum economic benefit from the property by devoting it to this use and that the value of the property was jeopardized by the near certainty that, once the sublease ended, the property's use as the location for a new-car dealership would be discontinued.

American reinforces Economy's arguments in this regard, and both appellants join in advancing similar arguments with respect to the other two objectionable (from Economy's standpoint) features of the sublease, found in the buy-sell agreement. The value of the property to Economy, say appellants, was threatened by the non-competition provision in the buy-sell agreement, because American was the most likely party to occupy the property after Garcia's lease had expired. To prevent American from competing with Garcia for a new lease deprived Economy of the opportunity to lease the property to a likely lessee on the most favorable terms. Similarly, the value of Economy's property was enhanced by its proximity to the Janpol property adjoining it on the north; American's agreement to transfer its interest in this property to Garcia at the end of the sublease deprived Economy of the opportunity to consolidate its property with the adjoining tract and thereby assure itself of this enhanced value.

The trial court was not persuaded by these reasons. It found: "Economy had no right in its lease or otherwise to withhold consent for these reasons.... Economy Rentals was not entitled to any of the three privileges or rights ... under its original lease to Garcia * * *." Although the court did not expressly find that Economy's three "reasons" were pretextual, it did find: "A substantial motivation in Economy's refusal to consent to the 1984 sublease was its resentment that the Garcias were to receive $7,500 per month in excess sublease

rental over and above the base rental payable to Economy; Economy wanted to share in the sublease rental." Accordingly, it found, "Economy's attempt to withhold consent to the 1984 sublease was unreasonable and its termination of the Garcia lease was wrongful."

We are required on appeal to indulge all reasonable inferences in support of the verdict or (in a nonjury case) the decision below. *Cowan*, 98 N.M. at 15, 644 P.2d at 529; *Tapia v. Panhandle Steel Erectors Co.*, 78 N.M. 86, 89, 428 P.2d 625, 628 (1967). We think that a reasonable inference in support of the trial court's decision is that Economy's predominant motive for refusing consent was to share in the increased rental value of its property—it wanted to improve its economic position and increase the return it was receiving on the value of the property. Contrary to Economy and American's position on appeal, this inference was supported by substantial evidence. Although the new, direct nine-month lease between Economy and American did not become effective until July 1, 1986, it was negotiated at an earlier time, and something like it could well have been contemplated when Economy terminated the Garcia lease. During the period from Economy's purported termination of the Garcia lease until June 30, 1986, American was paying Economy $3,000 and another $7,500 into escrow. But thereafter, Economy more than doubled its rent from the property and received $7,000 per month directly from American. Economy's president, Mrs. Kelly, testified that she "always felt [the Garcia lease] was too low a lease." When she offered to settle with Garcia in November 1985, she proposed a new lease, under which Garcia's rent would be increased from $3,000 per month to $6,000 per month and then to $7,200 per month. Clearly there was no objection to American as the subtenant; Economy had unconditionally consented to the oral sublease in 1979 and had consented again to a proposed (but unconsummated) assignment of the lease from Garcia to American in 1983. Economy did not inquire into the terms of the arrangement between Garcia and American on these occasions, and Economy's three professed reasons for objecting to the sublease in 1984 may have appeared to be after-the-fact justifications of its action. In any event, the question is not whether on this record we would have arrived at the same conclusion concerning the operative facts as did the trial court; we must decide whether there was substantial evidence to support the court's findings, and we hold that there was.

■ This does not mean that we agree with all of the trial court's reasons for finding that Economy's objections to the sublease were unreasonable. In noting that Economy was not entitled under the prime lease to any of the three "rights" or "privileges" on which it relied in objecting to the sublease, the trial court appears to have adopted the view, vigorously pressed on us by Garcia, that the lease itself defines what is a reasonable ground for objecting to an assignment or sublease, and only when a proposed transfer of the lessee's interest would be in violation of the basic lease can the lessor object to the transfer. Garcia relies on our statements in *Boss Barbara* and *Cowan* that consent is not to be withheld unless the prospective tenant is unacceptable under the same standards as were applied in accepting the original tenant. She also relies on the following statement from an important case in this area, *1010 Potomac Associates v. Grocery Manufacturers of America, Inc.*, 485 A.2d 199, 210 (D.C.App.1984):

[I]t is unreasonable for a landlord to withhold consent to a sublease solely to extract an economic concession or to improve its economic position. The purpose of the consent clause is protection of the landlord in its ownership and operation of the particular property, not protection of the landlord's general economic condition. The landlord has no reasonable basis for withholding consent if the landlord remains assured of all the benefits bargained for in the prime lease.

[Citations omitted.]

Although we agree with much of the language in the foregoing quotation, we think Garcia's proposed limitation on the right to withhold consent is too narrow. The statement in *Boss Barbara*, reiterated in *Cowan*, that a tenant's acceptability must be gauged by the same standards as were applied when the original lease was entered into was not meant to limit all bases for refusing consent to those expressed or implied in the original lease. Many circumstances may change; many conditions originally unforeseen may arise; many facts may develop from the time the original lease is signed to the time of a proposed assignment or sublease that may well justify a lessor's withholding of consent in light of the circumstances obtaining at the time of the proposed transfer and in light of the terms of the transfer itself.

We know of no authority expressly holding that the reasonableness of a refusal to consent to a proposed transfer can only be measured by looking at the terms of the original lease. *1010 Potomac* certainly does not so hold. In that case one of the lessors admitted that the sole basis for withholding consent was "essentially economic in nature"—*i.e.*, a desire that the lessee split with them the difference between the rent due under the prime lease and that to be received by the lessee under the proposed sublease. 485 A.2d at 204. It was entirely understandable, then, that the court would hold:

> In refusing to consent to the sublease, the landlord sought merely to improve upon the bargain negotiated in the prime lease. The original negotiations having established the balance of risks accepted by both the landlord and [the tenant] * * *, the landlord cannot reasonably demand that [the tenant] alter that balance to the landlord's advantage and [the tenant's] disadvantage as the price for the landlord's consent to a sublease to an admittedly suitable subtenant, under conditions that fully protect the landlord's bargain under the prime lease.

*Id.* at 210.

However, when the landlord refuses consent, not because of a desire to "extract an economic concession or to improve its economic position," but to avoid some threatened economic injury—to guard against some deterioration in its economic position—the refusal might well be justified and reasonable. Just as there are numerous cases holding, consistently with *1010 Potomac*, that securing an economic benefit is not a proper reason for withholding consent—*e.g.*, *Kendall v. Ernest Pestana, Inc.*, 40 Cal.3d 488, 220 Cal.Rptr. 818, 709 P.2d 837 (1985) (in bank); *Ringwood Assocs., Ltd. v. Jack's of Route 23, Inc.*, 153 N.J.Super. 294, 379 A.2d 508 (1977); *Krieger v. Helmsley–Spear, Inc.*, 62 N.J. 423, 302 A.2d 129 (1973)—so also are there many cases holding that the landlord's interest in protecting itself from economic disadvantage is legitimate and may furnish a reasonable basis for withholding consent. *E.g.*, *United States v. Toulmin*, 253 F.2d 347 (D.C.Cir.1958) (insolvent tenant would retain legal title to fixtures already partially paid for by landlord); *Fourchon Docks, Inc. v. Milchem, Inc.*, 849 F.2d 1561 (5th Cir.1988) (lessor would sustain economic loss from lessee's termination of lease on adjoining property and possible devaluation of leased property from short-term sublease); *Warmack v. Merchants Nat'l Bank of Ft. Smith*, 272 Ark. 166, 612 S.W.2d 733 (1981) (shopping center lessor's acceptance of bank tenant's proposed substitution of savings and loan association would have been to shopping center's disadvantage); *Time, Inc. v. Tager*, 46 Misc.2d 658, 260 N.Y.S.2d 413 (1965) ("Balkanization" of leased premises through multiple subtenancies could have been to landlord's disadvantage).

■ Economy and American rely on *Kendall v. Ernest Pestana, Inc.* as support for a general standard of "commercial reasonableness" in deciding whether the lessor has unreasonably withheld consent. *See Kendall*, 40 Cal.3d at 502, 220 Cal. Rptr. at 827, 709 P.2d at 846 (referring to rule that lessor may refuse consent on any commercially reasonable ground). In *Kendall*, the California Supreme Court fol-

lowed *Boss Barbara* in adopting the minority rule that consent, even apart from a clause in a lease, may not be unreasonably withheld and relied in part, as we did in *Boss Barbara,* on the covenant of good faith and fair dealing implied in a lease. As we have seen, the court held it was not reasonable for the landlord to deny consent in order to charge a rent higher than that originally contracted for. *Id.* at 501, 220 Cal.Rptr. at 826, 709 P.2d at 845. The court also took note, however, of another implied covenant in leases—that " 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.' " *Id.* at 500, 220 Cal.Rptr. at 825, 709 P.2d at 842 (quoting *Universal Sales Corp. v. California Press Mfg. Co.,* 20 Cal.2d 751, 771, 128 P.2d 665, 677 (1942)). The court in *Kendall* enumerated several factors to be considered in deciding whether a refusal to consent is reasonable, *see id.* at 501–02, 220 Cal.Rptr. at 826–27, 709 P.2d at 845–46, such as the proposed assignee or subtenant's financial responsibility, the suitability of the proposed use, the need for alteration of the premises, and the nature of the occupancy. The court did not, however, attempt to formulate a comprehensive test.

The test proposed by Economy and American—that a reasonable ground for refusing consent is any ground which is commercially reasonable—is obviously unsatisfactory; not only does it beg the question, it also is too broad. Under the decided cases and in light of the applicable implied covenants in a commercial lease, we believe a fair formulation of an appropriate test is the following: A lessor may refuse consent when the proposed assignment or sublease would injure or impair the lessor's interest in the leased property, such as by devaluing it (and thereby reducing the benefits bargained for in the original lease), but not when the lessor seeks to improve its economic position, such as by sharing in the sublease rent or by securing a benefit not bargained for in the original lease. And, in light of existing caselaw and considering the disfavor in which restraints on alienation are viewed,[7] the lessor's interest to be protected by refusing consent must relate to the ownership and operation of the leased property, not the lessor's general economic interest. *See Kendall,* 40 Cal.3d at 501, 220 Cal.Rptr. at 826, 709 P.2d at 845 (" '[T]he clause is for the protection of the landlord in its ownership and operation of the particular property—not for its general economic protection.' ") (emphasis omitted) (quoting *Ringwood Associates,* 153 N.J.Super. at 303, 379 A.2d at 512, and *Krieger,* 62 N.J. at 423, 302 A.2d at 129).

It is not necessary for us to decide whether any of Economy's professed reasons for refusing consent to the Garcia–American sublease were reasonable under the foregoing standard. At least one of those reasons—the short term of the sublease in relation to the remaining term of the prime lease, along with the probable discontinuation of a new-car dealership on the premises—would appear to fall within the concern reflected in the standard for the lessor's legitimate interests in maintaining the value of the leased property. However, the trial court found, as we read its findings, that this was not the real or predominant motivation behind Economy's refusal; the real or primary motivation was the forbidden one of increasing the economic benefit from the lease. As such, it was unreasonable. Economy's consequent termination of the lease was therefore wrongful, and Economy thereby breached the lease. We affirm the trial court's decision on this point.[8]

---

**7.** *See Boss Barbara,* 97 N.M. at 241, 638 P.2d at 1086 (reasonable restraints upon alienation of property are to be strictly construed).

**8.** This disposition makes it unnecessary for us to rule on the trial court's other reasons, argued at some length in the parties' briefs, for its holding that Economy improperly withheld consent to the sublease.

## III. *Relief*

### A. *Compensatory Damages for the Sublease Period*

Economy vehemently argues that, even if the trial court properly ruled that it had unreasonably withheld consent to the sublease, there was no basis for the court's award of damages to Garcia of $180,000, which represented the monthly sublease rent of $7,500 for the twenty-four months from April 1985 through March 1987. Economy particularly attacks the court's imposition of a judgment decreeing that Economy was jointly and severally liable with American for this $180,000 (plus, as will be discussed below, $91,125 of prejudgment interest). Its argument, however, on this point is rather scant; its sum and substance is: "The Court's Conclusions of Law Nos. 4 and 9 [holding Economy jointly and severally liable for Garcia's compensatory damages] transform the admitted liability of American Toyota on its promissory notes into a joint and several liability of Economy Rentals along with American Toyota. Strange alchemy!"

■ Analytically, the court may have incorrectly measured the damages sustained by Garcia from Economy's breach of the lease. In the absence of other elements of damage, the tenant is entitled to recover from the landlord the reasonable rental value of the leased premises, less the rent payable to the landlord. *See Barfield v. Damon,* 56 N.M. 515, 523, 245 P.2d 1032, 1037 (1952); *Restatement (Second) of Property* § 10.2(1) (1976). Here, the reasonable rental value of the premises was not the $7,500 per month payable by American under the sublease (plus the $3,000 per month that American agreed to pay directly to Economy), because the sublease cov-

ered *both* the Economy property and the Rogers property. Thus, the trial court arguably should have determined the reasonable rental value of the Economy property alone and used that as the measure of the rental value of which Garcia was deprived by Economy's wrongful termination of the lease.[9]

■ However, the trial court found that Garcia suffered an additional element of damage besides the loss of the property's rental value—namely, "American's nonpayment of sublease rental to Garcia." The court found that Economy's termination of the Garcia lease and its later direct lease with American were proximate causes of American's refusal to vacate the property when its sublease expired on June 30, 1986, and proximate causes of American's withholding the sublease rent. The court also found that Economy and American acted "in concert with one another." These findings invoke the additional rule as to measure of damages in *Barfield v. Damon* that "special damages which are within the contemplation of the parties and resulting directly and proximately from the breach, are recoverable if they can be established with reasonable certainty." 56 N.M. at 523, 245 P.2d at 1037. The rule as stated in the *Restatement* is that, when the leased property is used for business purposes, damages include "loss of anticipated business profits proven to a reasonable degree of certainty, which resulted from the landlord's default, and which the landlord at the time the lease was made could reasonably have foreseen would be caused by the default[.]" *Restatement (Second) of Property* § 10.2(5). Although there was no explicit finding that, when the lease was executed in 1977, the parties contemplated that a breach by Economy would result in

---

9. There was evidence that that rental value was probably about $7,000 per month. The sublease rent was $7,500 per month, and the rent payable for the Rogers property was $540 per month. In her settlement proposal to Garcia in November 1985, Mrs. Kelly proposed that the rent on the Economy property be increased over time to $7,200 per month. And in the agreement nego-

tiated directly between Economy and American for the nine months after June 30, 1986, the rent was fixed at $7,000 per month. The evidence easily would have supported a finding that Garcia's damages flowing from Economy's breach were $4,000 per month ($7,000 rental value less $3,000 rent payable), rather than the $7,500 per month actually awarded by the trial court.

American's withholding its sublease (then an oral sublease) payments to Garcia, such a finding would have been well within the evidence; Economy knew from the outset that American occupied the property as Garcia's subtenant, and it was easily foreseeable that a termination by Economy of Garcia's right to possession could result in American's ceasing to pay rent to its sublessor Garcia.

The trial court's finding that Economy's breach proximately caused American's nonpayment of sublease rent was supported by substantial evidence. Among other things, Rivera testified that American withheld the rent because of Economy's termination of the lease, and a statement to the same effect appeared in the escrow agreement between American and the bank. Had Economy not declared the lease terminated, American would have had no excuse for failing to honor the promissory notes and comply with the Grant of Leaseholds obligating it to pay Garcia $7,500 per month. Economy was therefore liable for this item of "special damage" or "loss of profits."

### B. Compensatory Damages for the Holdover Period

■ Both Economy and American argue that the trial court had no basis for awarding compensatory damages of $67,-500 against them. This amount represents the monthly sublease rental of $7,500 times the nine months during which American remained in possession after termination of the sublease (from July 1, 1986, to March 31, 1987). American, however, does not seriously dispute that the relationship between it and Garcia after the sublease ended (assuming the primary lease was still in effect) was a holdover tenancy, continuing from month to month. See Hofmann v. McCanlies, 76 N.M. 218, 413 P.2d 697 (1966). As a holdover sublessee, American

was obligated to pay the reasonable rental value to its sublessor, Garcia, for the time it held over. Strauss v. Boatright, 160 Colo. 581, 587, 418 P.2d 878, 881 (1966); see T.W.I.W., Inc. v. Rhudy, 96 N.M. 354, 359, 630 P.2d 753, 758 (1981) (owner entitled to fair rental value of leased premises during holdover period). To determine the reasonable rental value, a court can properly use the rental payment in a lease. Didamo v. Tyrol Sport Arms Co., 680 P.2d 1328 (Colo.App.1984). Here, the sublease rental was $7,500 per month, and the court found that this was in fact the fair rental value of the property.[10] American, therefore, was obligated to Garcia for this amount until it vacated the property it previously had subleased.

As to Economy, the same analysis applies to its liability to Garcia for this nine-month period as has been applied above to its liability for the sublease period. That is, the trial court found that a proximate result of Economy's attempted termination of the lease was American's withholding rental payments that otherwise would have gone to Garcia. This finding—together with the fact that Garcia was entitled to possession under the lease and to the reasonable rental value of the leased property until termination of the lease on March 31, 1987—supports the trial court's award of compensatory damages of $67,500 against Economy.

### C. Prejudgment Interest

■ Economy and American attack the trial court's award of prejudgment interest at the statutory rate of 15 percent from the date each $7,500 payment was due to the date of trial. Both appellants base their argument primarily on the fact that the promissory notes under which American was to pay $7,500 per month to Garcia provided for no interest. They contend

---

**10.** Once again, since the sublease covered both the Economy property and the Rogers property, it is not entirely accurate to say that $7,500 was the fair rental value for American's holdover on the Economy property. However, the parties make no mention of this distinction and, in any event, American's right to possession derived from the preexisting sublease with Garcia; the rent under that sublease was $7,500 per month.

that "when an express provision of a contract stipulates that a payment obligation is to bear no interest, there can be no implied contract to pay the interest under [the] statute[,]" citing NMSA 1978, Section 56–8–3 (Repl. Pamp.1986), and *Murdock v. Pure–Lively Energy 1981–A, Ltd.*, 108 N.M. 575, 775 P.2d 1292 (1989).

The difficulty with this argument is that the obligation to pay prejudgment interest, at least in a case like this, is not based on a contract; it arises by operation of law and consists of damages "to compensate a plaintiff for injuries resulting from the defendant's failure to pay and the loss of use and earning power of plaintiff's funds expended as a result of the defendant's breach." *Kueffer v. Kueffer*, 110 N.M. 10, 12, 791 P.2d 461, 463 (1990); *see also United Nuclear Corp. v. Allendale Mut. Ins. Co.*, 103 N.M. 480, 488, 709 P.2d 649, 657 (1985); *Shaeffer v. Kelton*, 95 N.M. 182, 187–88, 619 P.2d 1226, 1231–32 (1980); C. McCormick, *Handbook on the Law of Damages* § 50 (1935) (" 'Interest as damages' is allowed by law, in the absence of any promise to pay it, as compensation for delay in the payment of a fixed sum or delay in the assessment and payment of damages.").

■ The fact that Section 56–8–3(A) fixes a statutory rate of 15 percent for interest "on money due by contract" does not preclude use of that rate in computing prejudgment interest as damages; the same rate is fixed for interest "on money received to the use of another and retained without the owner's consent expressed or implied[.]" Section 56–8–3(B). Interest as damages is computed at the statutory rate, C. McCormick, *supra*, § 52, and finding an implied contract to pay interest is not necessary in order to apply Section 56–8–3(B).

The trial court found that the $7,500 monthly payments under the promissory notes were readily ascertainable at the time each became due, which they clearly were. Garcia was therefore entitled to prejudgment interest as a matter of right from

American. *Kueffer*, 110 N.M. at 12, 791 P.2d at 463; *Bill McCarty Constr. Co. v. Seegee Eng'g Co.*, 106 N.M. 781, 783, 750 P.2d 1107, 1109 (1988). Since we have held that Economy was liable for the same damages as American, and since those damages were equally ascertainable by Economy as by American, it follows that the prejudgment interest award against Economy should also be sustained.

### D. *Joint and Several Liability*

■ Economy objects to the trial court's adjudication of its liability to Garcia as joint and several with that of American. Economy's cryptic comment, however, about this adjudication ("Strange alchemy!") does not enlighten us as to the basis for the objection. In any event, we conclude that the court's declaration of joint and several liability, while perhaps technically not strictly correct, has no practical consequence, at least at present, and provides no basis to upset the court's judgment.

■ "Joint and several liability" is a term that is used most often in tort law and denotes the kind of liability imposed against multiple actors who, for public policy reasons, are held liable to a victim for all of the victim's damages. *See, e.g.*, NMSA 1978, § 41–3A–1(C) (Repl. Pamp.1989) (imposing joint and several liability for intentional harm, in situations involving vicarious liability or strict liability for a defective product, or for other public policy reasons). Each actor, however, shares that liability with all other actors, so that the victim may proceed against any of the actors for all of his or her damages but may not have more than a single recovery. *Powell v. Powell*, 370 P.2d 909, 911 (Okla. 1962). In the law of contracts, joint and several liability usually arises when two or more promisors in the same contract promise the same or different performances to the same promisee. *See Restatement (Second) of Contracts* §§ 288, 289 (1981). In New Mexico, contractual obligations which

by the common law would be joint only are now by statute joint and several obligations, NMSA 1978, Section 38–4–3 (Repl. Pamp.1987), and so it may not make much practical difference whether an obligation is described as "joint," "several," or "joint and several."

In the present case, the promises of Economy and American to Garcia appeared in different contracts and promised different performances. Economy promised Garcia the right to possession of the Economy property; American promised, by the Grant of Leaseholds and the promissory notes, to pay sublease rent of $7,500 per month. These promises therefore probably gave rise, technically, to the "several" liability of each promisor, not "joint and several" liability. However, from a nontechnical standpoint, the judgment adjudicating the liability of each promisor established that both parties shared the same liability, and that while Garcia could proceed against either to enforce its liability, she could have but a single satisfaction. From that standpoint, the judgment can be correctly described as adjudicating the joint and several liability of each defendant.

■■■■ A practical consequence of classifying each defendant's liability could be to determine whether either of them will have the right of contribution or indemnity from the other if one pays all or a portion of the judgment. At common law, parties who are jointly and severally liable on a judgment have no right of contribution; any right of indemnity arises from a suretyship relation established by contract or imposed by law. *See Rio Grande Gas Co. v. Stahmann Farms, Inc.* 80 N.M. 432, 434, 436, 457 P.2d 364, 366, 368 (1969); *see also Restatement of Restitution* § 102 & comment a (1937) (tortfeasor cannot obtain contribution from another tortfeasor). Because neither party raises this point, we shall not deal with it, except to express some doubt that Economy could properly be held to pay the entire judgment without a right of indemnity from American. American had the benefit of the sublease, including the holdover tenancy; it seems only fair that it should pay not only the $112,500 as to which it admits liability but also the $67,500 for the holdover rent and the prejudgment interest obligation attached to both amounts.

### E. *Punitive Damages*

■■■■ The trial court made identical findings with respect to Economy and American's respective breaches of the lease and the sublease—that each breach was "willful, in bad faith, and done in reckless disregard of Garcia's rights, thereby entitling Garcia to an award of punitive damages" of $5,000 from Economy and $50,000 from American. Appellants attack these findings as unsupported by substantial evidence.

We have already reviewed the court's findings that a substantial motivation of Economy's refusal to consent to the sublease was its "resentment" that Garcia was to receive $7,500 per month over and above the base rental payable to Economy and that Economy wanted to share in this increased rent. We have also reviewed the court's finding that Economy's termination of the prime lease and new direct lease with American after the sublease expired were proximate causes of American's refusal to vacate at the end of the sublease and of American's nonpayment of the sublease rental and the finding that Economy and American wrongfully acted "in concert" with one another. In addition, the court was entitled to infer from all these facts and from the new direct lease following the sublease, under which American reduced its monthly obligation for occupancy of the Economy property from $10,500 to $7,000, that American had a motive similar to Economy's—to improve its economic position. The court did not expressly find that Economy and American colluded to cut Garcia out of the middle and to increase the rent (in Economy's case) or decrease the rental expense (in American's case), but this inference follows readily from the facts it did find.

As noted above, we indulge on appeal all reasonable inferences in support of the trial court's decision. An award of punitive damages is discretionary and will be upheld if substantial evidence supports the award. *Thompson v. Ruidoso–Sunland, Inc.,* 105 N.M. 487, 493, 734 P.2d 267, 273 (Ct.App.1987). Of course, the trial court's factual findings must satisfy the legal standard or standards for a punitive damage award.

We recently canvassed the standards in New Mexico for punitive damages in a breach of contract case. *Construction Contracting & Management, Inc. v. McConnell,* 112 N.M. 371, 375, 815 P.2d 1161, 1165 (1991). We shall not reiterate those standards here. As we observed there, an intention to inflict harm on the nonbreaching party or conduct which violates community standards of decency (usually manifested by a culpable mental state such as malice, reckless disregard of another's rights, etc.) is a prerequisite for imposition of punitive damages, even when the breach is intentional. Here, there is no evidence that Economy and American breached their respective contracts out of a desire to harm Garcia, but their conduct—acting in collusion to improve their economic position—can be said to violate community standards of decency, involving as it did the lessor and sublessee's joining forces to exclude the lessee. The trial court acted within its discretion and within the law in awarding punitive damages.

### F. *Attorney's Fees*

The trial court correctly found that Garcia was entitled to recover attorney's fees from American under the promissory notes embodying the sublease rental obligation. The court found that approximately half of the fees incurred by Garcia in the case were necessary to recover the withheld note payments. It therefore halved Garcia's total attorney's fees through the trial, which equaled $146,000 and consisted of $136,000 actually expended plus an estimated $10,000 for preparation and trial.

The amount of fees awarded was thus $73,000.

American challenges this award as unsupported by any evidence. American points to cases in which we have enumerated the factors (the so-called *"Fryar"* factors, from *Fryar v. Johnsen,* 93 N.M. 485, 488, 601 P.2d 718, 721 (1979)) to be applied in determining the reasonableness of a fee awarded a party in litigation. *See, e.g., Lenz v. Chalamidas,* 109 N.M. 113, 118, 782 P.2d 85, 90 (1989); *Ulibarri v. Gee,* 106 N.M. 637, 639, 748 P.2d 10, 12 (1987); *Budagher v. Sunnyland Enters. Inc.,* 93 N.M. 640, 641, 603 P.2d 1097, 1098 (1979). American correctly asserts that the court's determination must be based on substantial evidence, citing *Maynard v. Western Bank,* 99 N.M. 135, 138, 654 P.2d 1035, 1038 (1982), and argues that the trial court's fee award in the present case was arbitrary and capricious for essentially two reasons: First, there was no evidence addressing the *Fryar* factors and, second, there was no correlation between the amount awarded and the services necessary to collect on the promissory notes. On the latter point, American insists that it has always acknowledged liability on the notes and that, therefore, very little if any of Garcia's actual fees were incurred in order to enforce payment of the notes.

Garcia responds, first, that the trial court had before it everything necessary to consider the appropriate factors—the voluminous record of the pretrial proceedings and the record of the six-day trial itself—and, second, that American's acknowledgment of liability rings hollow because Garcia has yet to collect any of the money promised in the notes. Litigation to enforce payment of the notes was necessary, says Garcia, because American had steadfastly refused to pay.

In our view, both parties' positions have some merit. We are reluctant to foster satellite litigation over attorney's fees, and we certainly are prepared to defer to the trial court's discretion in fixing amounts

based on the court's observations of the attorneys before it and the conduct of the trial itself. However, merely halving the total amount of fees incurred in litigation and assigning one of those halves to collection of the promissory notes, without any further explanation, smacks of an arbitrary, "eyeball" estimate. The trial court need not hold an extensive hearing for the purpose of taking evidence on factors already known to it from the trial, such as the time and labor required and the novelty and difficulty of the questions involved; but the court should receive evidence, if offered, on other factors that may not have emerged from the trial, such as the likelihood that the particular employment precluded the lawyer's other employment and the fee customarily charged in the locality for similar services.

■ Similarly, when the attorney's services are rendered in pursuit of multiple objectives, some of which permit an award of fees and some of which do not, the court must make a reasoned estimate, based either on evidence or on its familiarity with the case at trial, of the proportion or quantum of services that are compensable and award fees only for those services. *See Ulibarri*, 106 N.M. at 639, 748 P.2d at 12 (award of fees associated with counterclaims and other questions collateral to enforcement of lien for which fees are recoverable must be closely scrutinized and is the exception, not the rule). In this case, the trial court might have found that American's payment of promissory notes was not forthcoming until the reasonableness of Economy's refusal to consent to the sublease was determined; on the other hand, the court might have found that payment of the notes to Garcia would have been made in all events once the possibility of duplicate liability to Economy was eliminated. Some of the issues, such as American's liability for rent during the holdover period, had nothing to do with its liability under the notes. Despite the potential for satellite litigation, such issues cannot be cursorily treated and decided by stroking with a broad brush.

Finally, to ensure that the court does indeed base its determination on evidence adduced or on factors brought out at the trial, to enable the parties to understand the basis for the award, and to permit this Court to perform its reviewing function, the trial court should make findings of fact on those factors established by evidence or developed at trial. *See Lenz*, 109 N.M. at 118, 782 P.2d at 90. The court's "finding" in this case was too cursory, and too much unrelated to anything developed at trial, to facilitate meaningful review. Accordingly, we reverse the award of attorney's fees and remand to the trial court for a new hearing on the issue of reasonable fees to be awarded Garcia for the services of her attorneys in enforcing the promissory notes. *See id.* at 119, 782 P.2d at 91. In this hearing, the trial court should also receive evidence on the amount of a reasonable fee to be awarded Garcia for the services of her attorneys on this appeal, insofar as those services relate to enforcement of the notes.

## IV. *Other Issues*

■ American raises two issues on which it claims to be entitled to reversal. The first relates to the trial court's admission of "parol evidence" on the subject of who was supposed to obtain Economy's consent to the Grant of Leaseholds. The subject arose at the closing of the buy-sell agreement in 1984, when one of American's attorneys allegedly stated that American would "take care" of obtaining Economy's consent to the sublease, despite the provision in the agreement that Garcia would obtain the consent. The trial court made several findings to the effect that American waived this requirement, relying in part on the alleged statement by American's attorney. We, however, have not relied on these findings for our conclusion that Economy, not Garcia, breached the lease. The fact that, as between Garcia and American, Garcia was obligated to obtain Economy's consent does not mean that when Garcia failed to do so—*i.e.*, failed to

obtain a consent which Economy was not, on these facts, legally entitled to withhold—Garcia thereby breached the lease. The issue is irrelevant to our disposition of this appeal; and if there was error in the admission of this "parol evidence"—which we doubt—the error was harmless. *See* SCRA 1986, 1–061.

■ American's second issue relates to the effect of the 1983 "assignment" of Garcia's interest in the Economy property. This was the document, signed by Economy but not by Garcia, under which Economy consented for a second time to American's possession of the Economy property. American contends that the document, though not signed by Garcia, was nevertheless effective, based in part upon one of Garcia's attorney's statements that Garcia's failure to sign the document did not affect the substantial rights of the parties. However that may have been, the subsequent 1984 transaction, in which the parties' (Garcia and American's) antecedent claims were compromised and released, clearly superseded their prior dealings and negotiations. By the Grant of Leaseholds, both parties—Garcia and American—reaffirmed the *status quo ante:* that Garcia was lessee and sublessor and American was sublessee of the Economy property. As with the question of who was to obtain Economy's consent, the question on the effectiveness of the 1983 "assignment" is irrelevant.

■ Finally, both Economy and American assert error because the trial judge refused to recuse himself when, after the trial, Garcia remarked to the judge that he might acquire an interest in some property involved in another case over which the judge was presiding and to which Garcia was a party. After this incident, Economy and American moved that the judge recuse himself; the court then held a hearing and entered findings of fact and conclusions of law, ruling that Garcia's remark was intended by her to be, and was understood by the judge to be, facetious. The court ruled

that under all of the circumstances surrounding the remark—an informal posttrial conference, the presence of adverse parties, the understanding on the part of everyone who heard it that the remark was intended as facetious and part of the good-natured bantering in which everyone was engaged—the remark did not create an appearance of impropriety and that there would be an unnecessary waste of judicial resources if the court's decision, which had already been announced, were vacated.

The court did not abuse its discretion. *See State v. Fero,* 105 N.M. 339, 343, 732 P.2d 866, 880 (1987); *Martinez v. Carmona,* 95 N.M. 545, 550, 624 P.2d 54, 59 (Ct.App.1980), *cert. quashed,* 95 N.M. 593, 624 P.2d 535 (1981).

The judgment is affirmed in part and reversed in part, and the cause is remanded to the district court for further proceedings in conformity with this opinion.

IT IS SO ORDERED.

SOSA, C.J., and RANSOM, J., concur.