866 P.2d 323

John B. CASTLE, J. Bob Herell, and Ellwade Corporation, a Texas corporation, Plaintiffs–Appellants,

v.

J.P. McKNIGHT, a/k/a Jud P. McKnight, and Beulah M. McKnight, Defendants–Appellees.

No. 21045.

Supreme Court of New Mexico.

Dec. 7, 1993.

Hinkle, Cox, Eaton, Coffield & Hensley, Harold L. Hensley, Jr., Andrew J. Cloutier, Roswell, for appellants.

Kenneth B. Wilson, Roswell, for appellees.

## OPINION

RANSOM, Chief Justice.

Plaintiffs-appellants John B. Castle, J. Bob Herell, and the Ellwade Corporation (collectively referred to in the singular as "Castle") appeal from a declaratory judgment entered against them and in favor of defendants-appellees J.P. McKnight and Beulah M. McKnight ("McKnights"). The trial court decided that a consent clause in a boundary line agreement placed no limitation on the McKnights from withholding consent to allow Castle to move established internal fences and that, in the absence of consent, the clause thus prohibited Castle from constructing a fence at a location consistent with the true boundaries of Castle's property. Finding that the agreement implies that withholding of consent be reasonable, we reverse and remand to the trial court for determination of whether the McKnights acted reasonably in withholding consent to erect the fences.

*Facts.* The Upper McKnight Ranch was operated by two brothers as a single ranching unit until February 10, 1977, when Joe W. McKnight and J.P. McKnight, along with their wives and other interested parties, divided the ranch by a series of special warranty deeds. On March 18, 1985, Joe W. McKnight and his wife sold their part to Herell, the Ellwade Corporation, Thomas F. Thaggard, and James W. Johnson (collectively, "the Ellwade group"). Thaggard and Johnson later sold their interest to John B. Castle. As part of the transaction between Joe McKnight and the Ellwade group, the latter requested that the McKnight brothers execute a "standard" boundary line agreement, the purpose of which was to confirm ownership of their respective ranches based not upon the fences but upon the true bound-

aries. The agreement specified that "[t]he location of any fences elsewhere than on the legal boundary . . . shall not change the ownership . . . by prescription, adverse possession, waiver, acquiescence or otherwise." The agreement also provided that "[t]he parties agree with one another that one party will not change the location of the boundary line fences between the Joe W. McKnight Ranch and the J.P. McKnight Ranch without the express written consent of the other party." There were no discussions or negotiations regarding this second provision; the attorney who drafted the agreement testified that he left it in as a "good neighbor" provision and J.P. McKnight testified that he did not rely on the "no change" provision in determining whether to sign the boundary line agreement.

For over fifty years prior to the 1985 agreement there existed an "internal cross fence" on the Upper McKnight Ranch that served the purpose of funneling livestock from pastures above one section of the ranch (section thirteen) to pastures on the other side of a sizeable ridge. When the ranch was divided, the fenceline in section thirteen formed a dip at the base of the ridge that protruded inside the true boundaries of the property now owned by Castle. The McKnights had been given an express easement across Castle's land in that section for roadway and pipeline purposes. Further over (in section eighteen), the internal cross fence again varied from the true boundaries of the Castle ranch. This fence served to funnel livestock to a well located on one acre that was deeded to the McKnights but is surrounded by land owned by Castle. The McKnights and Castle each own a one-half interest in the well. In 1992, Castle began erecting new fences along the true boundary in section eighteen so that he could take advantage of grazing his sheep on approximately forty-four acres of his unfenced pasture. The McKnights intervened, preventing the construction, and later refused to grant consent after formal negotiations. This declaratory judgment action ensued.

The trial court found that the removal of the dip in the section thirteen boundary fence "would significantly impede the opera-

tion of the McKnight Ranch," but also found that the relocation of the fence in section eighteen "would not have significant impact on the operation of the McKnight Ranch" if Castle provided reasonable access to the well (a condition to which Castle has agreed). Ultimately, however, the court decided that the boundary line agreement placed no limitation on the refusal to consent to relocation of the fence. "The tenor of the Boundary Line Agreement would be materially changed by adding a provision that consent to move the fence could not be unreasonably withheld."

*The McKnights waived their right to challenge the propriety of existing fences.* In 1985, without objection from the McKnights, Castle erected a fence (conforming to the true boundaries) that removed a portion of the dip in section thirteen. The court found that the McKnights have abandoned any claim to use the land encompassed by the 1985 fence in section thirteen except as permitted by express easement. The McKnights have not challenged that finding and thus cannot challenge on appeal the propriety of the existing fence in section thirteen. *See Springer Corp. v. Kirkeby–Natus,* 80 N.M. 206, 208, 453 P.2d 376, 378 (1969) (stating that findings not attacked on appeal are binding on the Supreme Court). Therefore, we limit our discussion to the question of consent regarding the building of new fences along the true boundary line.

■ *No evidence exists to support claim that for the unrestricted right of consent, the McKnights bargained away any possible ownership rights by acquiescence.* The McKnights argue that they bargained for the benefit of using Castle's land and should not lose the benefit of this bargain. They argue that under the doctrine of acquiescence established in *Sachs v. Board of Trustees,* 89 N.M. 712, 557 P.2d 209 (1976), they had a right to claim as their own the land up to the fence at the time of the sale to the Ellwade group, and that they bargained that right away in exchange for the agreement not to change the fenceline. In *Sachs,* this Court held that when "adjoining landowners acquiesce in a fence as a boundary for all of the purposes to which a property was placed

during the period involved, as a matter of law the doctrine of acquiescence applies to make that fence the boundary for subsequent uses of the property." 89 N.M. at 719, 557 P.2d at 216. The adjoining landowners had recognized the fence as the boundary for more than twenty years and the Court found that it was built for the purpose of establishing the boundary line between the two tracts of land. *Id.* at 720, 557 P.2d at 217. The length of time that the fence was recognized as the boundary was a primary factor in the Court's determination that ownership changed by acquiescence. *See id.*

In *Tresemer v. Albuquerque Public School District,* 95 N.M. 143, 144, 619 P.2d 819, 820 (1980), this Court interpreted *Sachs* as requiring four elements to prove acquiescence and stated that parties cannot claim that a boundary is not a true boundary when there are: "(1) adjoining landowners (2) who occupy their respective tracts up to a clear and certain line (such as a fence) (3) which they mutually recognize and accept as the dividing line between their properties (4) for a long period of time." We determined that because the deed in *Tresemer* described an arroyo and not an existing fence as the boundary between the tracts and because the evidence did not support a finding that the owners consented to the fence as a boundary, the owners had not acquiesced in recognizing the fence as the true boundary. *Id.* at 145, 619 P.2d at 821.

In the instant case, the internal cross fence was not built as a boundary line between two separately-owned parcels of land. The McKnight brothers divided the original ranch according to section lines as described in the warranty deed that transferred ownership of part to Joe McKnight, even though the internal cross fence already existed. As in *Tresemer,* this fact shows that J.P. and Joe did not recognize the fences as the true boundaries between the two newly-formed ranches. Further, there is no evidence to support the argument that the McKnights bargained away a claim to ownership of the land. As stated above, J.P. testified that he did not rely on the "no change" provision in determining whether to sign the boundary line agreement.

■ *The consent clause contains an implied covenant of reasonableness.* While a court will not imply a standard of reasonableness in the face of the parties' expressed intent to the contrary, if a contract is silent regarding the manner of performance, "a term which is reasonable in the circumstances is supplied by the court." Restatement (Second) of Contracts § 204 (1981); *see, e.g., Smith v. Galio,* 95 N.M. 4, 7, 617 P.2d 1325, 1328 (Ct.App.1980) (holding that where contract is silent as to the time for performance, a reasonable time will be implied).

> In searching for what [may be] called "the essence of the agreement," a court seeks a fair bargain. It may ... justify the term it supplies on the ground that the term prevents one party from being in a position of "economic servility" and "completely at the mercy" of the other.

2 E. Allen Farnsworth, *Farnsworth on Contracts* § 7.16, at 307 (1990) (footnote omitted). A standard of reasonableness is often implied in a variety of circumstances. In *Clayburgh v. Clayburgh,* 218 A.D. 411, 218 N.Y.S. 457 (1926), a husband and wife executed a separation agreement wherein the wife agreed *not to remove property from the husband's residence without his prior consent.* When she tried to remove property that she proved belonged to her, the husband prevented its removal, and the wife brought suit for conversion. The court examined whether allowing the husband to withhold consent arbitrarily would make the contract unreasonable and place one of the parties at the mercy of the other and found that "[t]he covenant ... on the part of the plaintiff not to remove her property without the consent of the defendant, implied a reciprocal obligation on the part of the defendant not to withhold such consent arbitrarily or for an unreasonable time." 218 N.Y.S.2d at 463. The court held that executing the agreement with that clause did not result in the husband gaining title to the wife's property, but that it only meant that she could not remove property immediately or remove property without judicial approval. *See also Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents,* 471 N.W.2d 859, 863 (Iowa 1991) ("[C]ontract will not be interpreted giving discretion to one party in a manner which would put one party at the mercy of another, unless the contract clearly requires such an interpretation.").

In New Mexico, we have implied in fact the term of reasonableness in withholding of consent when a lease agreement contains a provision requiring the landlord's consent before a tenant may sublease the property. *See Economy Rentals, Inc. v. Garcia,* 112 N.M. 748, 759, 819 P.2d 1306, 1317 (1991); *Boss Barbara, Inc. v. Newbill,* 97 N.M. 239, 240–41, 638 P.2d 1084, 1085–86 (1982). Our rationale in requiring reasonableness in lease cases is two-fold: the lease contract is subject to the covenant of good faith and fair dealing and is subject to the covenant that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Economy Rentals,* 112 N.M. at 759, 819 P.2d at 1317 (quoting *Kendall v. Ernest Pestana, Inc.,* 40 Cal.3d 488, 220 Cal.Rptr. 818, 823, 709 P.2d 837, 842 (1985) (in bank)).

Reasonableness in performance of a contract may be implied to prevent frustration of the primary purpose of the agreement by a collateral clause. For example, in *Sun Insurance Services, Inc. v. 260 Peachtree Street, Inc.,* 192 Ga.App. 482, 385 S.E.2d 127 (1989), *cert. denied,* a clause in a lease required consent of the landlord before the tenant was allowed to make repairs. A separate clause required that any repairs or improvements be equal in quality to the original condition of the premises. The court found that "[t]he coupling of the second clause to the first impliedly creates a standard of reasonableness to be applied to the issue of consent." 385 S.E.2d at 128. The court balanced the interests of the lessee in maximizing the use of its leasehold with the interests of the lessor in maximizing its capital asset. "If the landlord reserved the absolute right to refuse consent, the clause pertaining to equal quality would be mere surplusage." *Id.*

Applying that principle to this case, there is no question that the primary purpose of the boundary line agreement was to establish

absolute ownership in Castle of the unfenced areas of his property. If the McKnights arbitrarily may refuse to allow Castle to exercise his ownership rights, the boundary line agreement provision would have no practical meaning. The coupling of the consent clause to the agreement requires that the court balance the interests of the parties and impose the standard of reasonableness so that the primary purpose of the agreement may be achieved.

Our holding today does not imply that parties are not entitled to contract for rigid rights and obligations; in fact, we prefer that parties do not leave for implication their respective duties. Where there are reciprocal obligations, however, the Court will look at the primary purpose of the contract and, absent language or conditions imposing a contrary result, will infer a standard of reasonableness in the performance of a consent clause.

■ *Conclusion.* We hold today that reasonableness in performance will be implied in fact by this Court in a contract dispute if a requirement of reasonableness in performance will achieve the apparent intent of the parties and the purposes of the contract, and so long as the parties do not expressly state a contrary intention. In this case, the trial court did not expressly find that the McKnights's refusal to consent was unreasonable under the circumstances. The court did find, however, that "[t]he removal of the dip in the boundary fence [in section thirteen] would significantly impede the operation of the McKnight Ranch" and that "[t]he relocation of the boundary fence to the true boundary in Section 18 would not have significant impact on the operation of the McKnight ranch if reasonable access to the Partnership Well were provided." Although these findings impliedly establish that the trial court believed that it was reasonable for the McKnights to withhold consent with respect to section thirteen but not reasonable for the McKnights to withhold consent with respect to section eighteen, the trial court did not make an express determination of reasonableness. Therefore, we reverse and remand this case so that the trial court can make a determination of reasonableness and enter judgment accordingly.

**IT IS SO ORDERED.**

MONTGOMERY and FRANCHINI, JJ., concur.