# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 98-CA-00246-SCT

*GULFSIDE CASINO PARTNERSHIP,*

*a Mississippi General Partnership*

*v.*

*MISSISSIPPI STATE PORT AUTHORITY*

*AT GULFPORT AND MISSISSIPPI DEPARTMENT OF ECONOMIC AND COMMUNITY DEVELOPMENT*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/09/1998 |
| TRIAL JUDGE: | HON. JASON H. FLOYD, JR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | E. CLIFTON HODGE, JR. |
| | JOHN VERNON WOODFIELD |
| | JAMES W. CRAIG |
| | JOHN W. ROBINSON, III |
| ATTORNEYS FOR APPELLEES: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CATHERINE LAVERINE FARRIS |
| | HARRY R. ALLEN |
| | DAVID W. CRANE |
| | J. ADRIAN SMITH |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 03/30/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 4/20/2000 |

**EN BANC.**

**WALLER, JUSTICE, FOR THE COURT:**

## INTRODUCTION

¶1. In this casino lease dispute involving the Copa Casino in Gulfport, Mississippi, we consider an appeal and a cross-appeal from the Harrison County Chancery Court. Finding no reversible error, we affirm.

## STATEMENT OF THE CASE

### I. Statement of Facts

#### A. Parties

¶2. Appellees Mississippi State Port Authority at Gulfport ("Port Authority") and Mississippi Department of Economic and Community Development ("MDECD") are agencies of the State of Mississippi vested by law with the responsibility for operating the Mississippi State Port at Gulfport ("the Port"). Appellant Gulfside Casino Partnership ("Gulfside") is a Mississippi general partnership which consists of three corporations: Gulfside Casino, Inc., a Mississippi corporation; Patrician, Inc., a Nevada corporation; and Artemis, Inc., a Nevada corporation. The two Nevada corporations are authorized to transact business in Mississippi, and, together with Gulfside Casino, Inc., they own and operate the Copa Casino in Gulfport.

### B. The original lease and its amendments

¶3. On August 20, 1992, the Port Authority leased land and berth space to Gulfside so that it could operate a dockside gaming and entertainment facility. On October 28, 1992, the lease was amended to approve an acquisition by Stanley B. MacDonald of a majority interest in Gulfside Casino, Inc. On May 12, 1993, the lease was amended again to allow the Copa to move from what was to be its permanent site at the southwest end of the East Pier to a site at the northwest corner of the main ship harbor, an area commonly referred to as "the Horseshoe." In this second amendment, Gulfside also agreed to acquire the leasehold interests of two other tenants at the Horseshoe location. On June 21, 1994, the parties executed a third amendment to reflect the change in lessee from Gulfside Casino, Inc., to Gulfside Casino Partnership. The third lease amendment also recites certain expenditures made by Gulfside in acquiring the adjoining leaseholds of the two other entities at the Horseshoe location.

### C. Terms of the original lease

¶4. Bill Edwards, as Executive Director of the Port Authority, negotiated the terms of the original lease. The lease allowed Gulfside to locate a pre-approved vessel on and make pre-approved improvements to the leased premises. The original lease allowed the Copa to operate at a temporary location on the East Pier, north of the permanent site, until improvements at the permanent site were complete.

¶5. The primary term of the lease was five years, and Gulfside had the option to extend the lease for three renewal periods of five years each.

¶6. Article XII, entitled "IMPROVEMENTS BY LESSEE," required Gulfside to make improvements, alterations and additions to the leased premises, including improvements to the berth area, land-side area, and parking area. The improvements were listed not in the body of the lease itself, but, instead, in an exhibit to the lease. Gulfside was also required to construct a land-side dining and entertainment complex consisting of at least twenty thousand (20,000) square feet within five years from the date of issuance of the Copa's gaming license, and to submit plans and specifications to the Port Authority for review and approval prior to construction.

¶7. Article XII (2) required Gulfside to submit plans and specifications to the Port Authority for its approval in order to make any improvements exceeding $25,000 in cost.

¶8. The lease contained a cancellation provision whereby the Port Authority could cancel the lease "at any time after the expiration of the Primary Term of [the] Lease for reason of Port expansion of its own facilities to handle expanded shipping and related commerce activities, unrelated to any business or enterprise which may compete with LESSEE's operations, . . . ."

### D. Negotiation of the second amendment

¶9. Pursuant to the terms of the original lease, the Copa opened a temporary location north of the permanent site on the East Pier. While the Copa occupied the temporary site, Edwards asked Gulfside to move what was to be its permanent site at the southwest end of the East Pier to the northwest corner of the main ship harbor, an area commonly referred to as to as "the Horseshoe" because another tenant, Duratex, was building a warehouse on the East Pier which would disturb the Copa's operations. At first, Gulfside representatives rejected Edward's proposal. However, after construction of the Duratex warehouse began, Gulfside agreed to negotiate a move to the Horseshoe. On November 19, 1992, the Port Authority passed a resolution authorizing Edwards to negotiate an amendment to the lease with Gulfside. Edwards negotiated the amendment with Hugh Keating, Gulfside's attorney.

### E. Terms of the second amendment

¶10. On May 12, 1993, the parties executed the second amendment which was reduced to writing by Ben Stone, the Port Authority's attorney. In addition to changing the Copa's permanent site to the Horseshoe , the lease's "TERM" article was amended in part to provide for a 10 year extension of the lease if Gulfside built a hotel on the leased premises or within the Gulfport city limits within the first ten years of the agreement.

### F. The denial of Copa's request to build a hotel

¶11. In 1994, Edwards resigned, and Ed Blakeslee, the President of the Port Authority's Board, and Stone took a more active role in relations with Gulfside.

¶12. On June 29, 1994, Tilley Constructors and Engineers, Inc., submitted Gulfside's plans for a hotel to the Port Authority Board. The plans showed the proposed location of the hotel, a parking garage site, and a proposed barge location. Tilley also discussed the plans with the Port Authority engineer and prepared an estimate of the cost of the hotel. Gulfside also employed an architect to prepare detailed drawings of the hotel, which drawings were also submitted to the Port Authority on June 29, 1994.

¶13. On July 29, 1994, Blakeslee responded to Gulfside's request as follows: "Until the master plan for Port development is adopted, it is premature to determine the best location for such a facility."

¶14. After reviewing and adopting a strategic plan, on October 26, 1994, the Port Authority Board rejected Gulfside's hotel plans and made it clear that it would not approve any plan for a hotel on the Copa's leasehold. On October 31, 1994, Blakeslee sent a letter to Pete Cladianos, Jr., President and Chief Executive Officer of the Copa, stating, "The construction of a hotel on Gulfside's leasehold interest would not be in the best short or long term interest of the Port."

### F. The denial of Copa's request to substitute a barge for the Copa vessel

¶15. Following the Port Authority's veto of hotel construction on the Copa's leasehold premises, Gulfside made requests to substitute a barge for the Copa vessel. The MDECD, by letter dated November 29, 1995, rejected Gulfside's requests.

### G. The Port gives notice of termination of the lease

¶16. On July 3, 1996, the Port Authority, pursuant to article XV, gave notice of its intent to cancel Gulfside's lease upon the expiration of the primary terms of the lease in October, 1999, due to the leased premises being needed to accommodate the expansion of Port facilities to handle expanded shipping and related commercial activities.

## II. Statement of Proceedings

¶17. On July 8, 1996, five days after giving notice of its intent to terminate the lease, the Port Authority filed suit against Gulfside in the Chancery Court of the First Judicial District of Harrison County, Mississippi. The Port Authority's complaint sought a declaratory judgment stating that neither the Port Authority nor MDECD had breached the lease in denying Gulfside's requests to construct a hotel and substitute a barge, or in canceling the lease. The Port Authority also requested that the court order Gulfside to vacate the Port's premises in October, 1999.

¶18. On August 19, 1996, Gulfside responded to the complaint with a motion to dismiss or, in the alternative, to transfer the action to the Circuit Court of the First Judicial District of Harrison County. Also on August 19, 1996, Gulfside filed a separate action in the Circuit Court of the First Judicial District of Harrison County against the Port Authority seeking damages for breach of contract, breach of the implied covenant of good faith and fair dealing, misrepresentation, and breach of the covenant of quiet enjoyment.

¶19. On September 23, 1996, the circuit judge entered an order transferring Gulfside's circuit court action to chancery court. On November 4, 1996, Gulfside filed a petition for interlocutory appeal of the circuit court's order transferring Gulfside's complaint to chancery court, and by order dated December 10, 1996, this Court denied Gulfside's petition for interlocutory appeal.

¶20. On January 15, 1997, Gulfside filed its Answer, Defenses and Counterclaim for Declaratory, Injunctive, and Monetary Relief in the chancery court restating the same claims against the Port Authority which were alleged in its circuit court complaint.

¶21. After ten days of trial, on January 9, 1998, the chancellor entered a judgment finding that (1) the Port Authority had no obligation to approve construction of a hotel upon the leased premises; (2) the Port Authority had no obligation to approve substitution of a barge for the pre-approved Copa vessel; (3) the Port Authority did not violate the terms of the lease in denying such requests; (4) the Port Authority's request for a declaratory judgment stating that it had effectively exercised its right of cancellation was denied; (5) the Port Authority's request that the court order Gulfside to vacate the premises was denied; and (6) Gulfside's counterclaim for damages against the Port Authority based upon breach of contract, breach of implied covenant of good faith and fair dealing, misrepresentation, and breach of the covenant of quiet enjoyment was denied.[(1)]

¶22. Gulfside appeals and raises the following issues for consideration by this Court:

> **I. WHETHER THE CHANCERY COURT ERRED IN MAINTAINING JURISDICTION OVER THE INSTANT ACTION.**
>
> **II. WHETHER THE COURT ERRED IN HOLDING THAT ITS SCOPE OF REVIEW OF THE PORT AUTHORITY'S ACTIONS UNDER THE LEASE WAS LIMITED TO WHETHER THE PORT AUTHORITY ABUSED ITS DISCRETION.**

**III. WHETHER THE CHANCELLOR ERRED IN NOT CONSTRUING THE LEASE AS IMPOSING A DUTY OF REASONABLENESS ON THE PORT AUTHORITY IN ITS CONSIDERATION OF GULFSIDE'S REQUEST TO CONSTRUCT A HOTEL ON THE LEASED PREMISES AND SUBSTITUTE A BARGE FOR THE COPA VESSEL.**

**IV. WHETHER THE PORT AUTHORITY ACTED UNREASONABLY IN DENYING GULFSIDE'S REQUEST TO CONSTRUCT A HOTEL ON THE LEASED PREMISES AND SUBSTITUTE A BARGE FOR THE COPA VESSEL.**

¶23. On cross-appeal, the Port Authority raises the following issues:

**I. WHETHER THE COURT ERRED IN DENYING A DECLARATORY JUDGMENT AND SPECIFIC PERFORMANCE THAT THE PORT AUTHORITY HAD EFFECTIVELY EXERCISED ITS RIGHT OF CANCELLATION PURSUANT TO PARAGRAPH XV OF THE LEASE.**

**II. WHETHER THE COURT ERRED IN DENYING A DECLARATORY JUDGMENT THAT THE PORT AUTHORITY HAD USED ITS BEST EFFORTS, PURSUANT TO PARAGRAPH XV OF THE LEASE, TO AID IN OBTAINING PROPERTY ON THE PORT FACILITY FOR RELOCATION OF GULFSIDE'S OPERATION.**

## DISCUSSION OF THE LAW

### Direct Appeal

**I. WHETHER THE CHANCERY COURT ERRED IN MAINTAINING JURISDICTION OVER THE INSTANT ACTION.**

¶24. Because we affirm the chancellor's judgment and find no need to remand this case, the issue of whether the chancery court properly exercised jurisdiction over this case is moot. The Mississippi Constitution provides that a mistake as to the jurisdiction regarding law or equity alone is an insufficient ground for reversal on appeal. Miss. Const. art. 6, § 147 (1890); *McLean v. Green*, 352 So. 2d 1312, 1314 (Miss. 1977).

**II. WHETHER THE CHANCERY COURT ERRED IN HOLDING THAT ITS SCOPE OF REVIEW OF THE PORT AUTHORITY'S ACTIONS UNDER THE LEASE WAS LIMITED TO WHETHER THE PORT ABUSED ITS DISCRETION.**

¶25. In finding for the Port Authority on Gulfside's counterclaim, the chancery court held that its review of the Port Authority's denial of Gulfside's requests for approval of its plans for hotel construction and barge substitution was limited:

This court finds that the allegation of Defendant/Counter-Plaintiff's Counterclaim alleging a breach of the lease for failure to approve a hotel, failure to approve substitution of a barge, violation of covenants of good faith and fair dealing and violations of a covenant of quiet enjoyment are all actions for which judicial review is limited.

¶26. According to the chancellor, any claim that a contract was breached by an administrative agency must

survive a rebuttable presumption which obligates the court to give substantial deference to the agency's interpretation and actions under its contractual duties. In determining the court's limited standard of review, the chancellor cited *Mississippi State Bd. of Nursing v. Wilson*, 624 So. 2d 485, 489 (Miss. 1993), an appeal from the revocation of a nursing license, and *Melody Manner Convalescent Ctr. v. Mississippi State Dep't of Health*, 546 So. 2d 972, 974 (Miss. 1989), an appeal from the health department's denial of a certificate of need.

¶27. The chancery court erroneously treated the instant action for breach of contract as though it were an appeal from a matter initially decided by an administrative agency, improperly applying an "arbitrary and capricious" standard of review instead of requiring the proper burden of proof:

> The court finds that MSPA and MDECD have not acted arbitrarily or capriciously, nor abused their discretion in their decisions which were made to deny Copa's request to construct a hotel, [or] to deny substitution of a barge . . . .

¶28. Although we have no precedent precisely on point with the issue at bar, our cases pertaining to breach of contract claims against a state agency are instructive. In *CIG Contractors, Inc. v. Mississippi State Building Comm'n*, 399 So. 2d 1352 (Miss. 1981), CIG filed suit against the Building Commission seeking damages resulting from the Commission's alleged breach of contract. The Building Commission asserted that it was not subject to suit because of sovereign immunity. In addressing this claim, reference was first made to Chapter 280 of the Laws of 1956 which set forth the powers granted to the Building Commission. Among those powers are the authority "[t]o contract and to be contracted with and to sue and be sued." The Court held:

> The general rule is that when the legislature authorizes the State's entry into a contract, the State necessarily waives its immunity from suit for a breach of contract. **Where the state has lawfully entered into a business contract with an individual, the obligations and duties of the contract should be mutually binding and reciprocal. There is no mutuality or fairness where a state or county can enter into an advantageous contract and accept its benefits but refuse to perform its obligations.**

399 So. 2d at 1355 (citations omitted) (emphasis added). *See also Quinn v. Mississippi State Univ., 720 So. 2d 843, 849-50 (Miss. 1998)* (the enforcement of implied contractual terms are enforced against the state in the same manner as they are against private contracting parties and thus sovereign immunity is waived in a breach of contract claim.); *Mississippi State Dep't of Pub. Welfare v. Howie*, 449 So. 2d 772, 776-77 (Miss. 1984).

¶29. While our standard of review is highly deferential to a state agency in determining whether the agency acted within its statutory authority, there is, of course, a difference between an appeal challenging an agency's decision under administrative law principles and a civil action against a state agency for breach of contract. When an agency contracts with a private individual, it becomes bound by more than just statutory law. Rather, by contracting with a private party, the agency promises to abide and be governed by the terms of the contract.

¶30. Under Miss. Code Ann. §§ 59-5-11 & -31 (1996), the MDECD, acting jointly with the Port Authority, is authorized to lease Port property for port, harbor, commercial and industrial purposes and may sue and be sued. Based therefore on the authority in *CIG Contractors, Inc.*, the general law of

contracts, and fundamental fairness, we find the chancellor erroneously employed a deferential standard of review. Hence, this Court will not give deference to the findings of fact by the trial court. *See Brooks v. Brooks*, 652 So. 2d 1113, 1117 (Miss. 1995); *Bank of Mississippi v. Hollingsworth,* 609 So.2d 422, 424 (Miss. 1992).

### III. WHETHER THE PORT AUTHORITY BREACHED THE LEASE AGREEMENT IN DENYING GULFSIDE'S REQUESTS TO CONSTRUCT A HOTEL ON ITS LEASED PREMISES AND SUBSTITUTE A BARGE FOR THE COPA VESSEL.

### A. The hotel

¶31. Regarding the operations and construction of improvements, the original lease contained the following pertinent provisions:

> LESSEE shall not make any additions, alterations or improvements which exceed $25,000 in or to the Vessel or the Leased Premises without Lessor's prior written consent. . . . Before commencing such alterations, LESSEE shall submit the plans and specifications thereof to LESSOR, for LESSOR'S written approval.
>
> * * *
>
> LESSEE shall submit in writing to the LESSOR the type and location of all business ventures and operations contemplated for the Vessel and Leased Premises whether operated by LESSEE or any other person. Prior to commencing any venture or operation, LESSEE must obtain LESSOR's approval.

Original lease, article XII (2); article V(8).

¶32. In the second amendment, the "TERM" paragraph of the original lease was amended as follows:

> In addition to the three (3) renewal periods of (5) years each, LESSEE shall have the option to further extend the Lease for an additional period of ten (10) years if LESSEE, within the first ten (10) years of this Agreement, constructs, on the Leased Premises or within the city limits of Gulfport, Mississippi, a Hotel with a minimum of 350 units, and has complied with all terms, covenants and conditions of the Lease. If such renewal option is exercised, the Lease term may be extended under the same terms and provisions of this Lease Agreement . . .

Second lease amendment, article IV.

¶33. Gulfside claims that under article IV of the second amendment, it has a right to construct a hotel on its leased premises, subject only to the requirement of article XII(2) of the original lease that "plans and specifications for 'improvements to the . . . Leased Premises' be submitted for the Port's written approval." The Port Authority contends that it has no obligation to approve Gulfside's plan to construct a hotel on the leased premises. Indeed, the chancellor found the terms of the contract, with few exceptions, to be clear and unambiguous and held that "the lease did not contain an obligation on the part of the [Port] to approve the construction of a hotel upon the lease premises . . . ."

¶34. The construction of contracts are questions of law to be reviewed *de novo*. **Mississippi State**

*Highway Comm'n v. Patterson Enterprises, Ltd.,* 627 So. 2d 261, 263 (Miss. 1993) (citing *Leach v. Tingle*, 586 So. 2d 799, 801 (Miss. 1991)).

¶35. In interpreting contractual clauses, this Court has stated the following:

> The most basic principle of contract law is that contracts must be interpreted by objective, not subjective standard. A court must effect a determination of the language used, not the ascertainment of some possible but unexpressed intent of the parties.

*Simmons v. Bank*, 593 So. 2d 40, 42-43 (Miss. 1992) (quoting *Cherry v. Anthony, Gibbs, Sage*, 501 So. 2d 416, 419 (Miss. 1987)). The *Simmons* Court also restated that "mere disagreement about the meaning of a contract clause does not make it ambiguous as a matter of law." *Id.* at 43.

¶36. When this Court finds itself proceeding to a rule of construction, we have generally relied on the "four corners" doctrine in interpreting instruments:

> In construing a written instrument, the task of the courts is to ascertain the intent of the parties from the four corners of the instrument. Courts look at the instrument under consideration as a whole and determine what the parties intended by giving a fair consideration to the entire instrument and all words used in it. When a written instrument is clear, definite, explicit, harmonious in all its provisions, and is free from ambiguity, a court in construing it will look solely to the language used in the instrument itself. In such a case a court will give effect to all parts of the instrument as written.

*Pfisterer v. Noble*, 320 So. 2d 383, 384 (Miss. 1975) (citations omitted). It is well settled that extrinsic evidence is not admissible to create an ambiguity in a written agreement which is complete and clear on its face. *See Cherry,* 501 So. 2d at 419.

¶37. The parties may have interpreted article IV of the second amendment differently, but an examination of the entire agreement reveals no ambiguity. The only mention of a hotel in the entire lease agreement is found in article IV of the second amendment which modifies the original "TERM" provision. This amended provision grants Gulfside the right to extend the term of the lease agreement *if* it constructs a hotel either upon the leased premises or in the city of Gulfport. The amended term provision does not, however, grant Gulfside the right to construct a hotel on the leased premises.

¶38. Article XII of the original lease, entitled "IMPROVEMENTS BY LESSEE," required Gulfside to construct or install improvements such as mooring dolphins, concrete and timber piers, metal gang-ways, utilities, a covered canopy, a parking facility and a 20,000 square foot dining and entertainment complex (both sides agree that the requirement to build the entertainment complex was deleted in the second amendment to the lease). As the Port Authority correctly contends, the use of "will and "shall" in the original lease to preface each improvement clearly expresses the Port Authority's and Gulfside's intent that Gulfside had the right and obligation to construct these improvements, subject only to the Port Authority's approval of the plans and specifications for such improvements.

¶39. The second amendment follows this same convention, where paragraph 7 of article XII provides the following:

> (a) The following new paragraph "(7)" shall be added to Article XII of the Lease Agreement

(7) LESSEE shall have the right to construct a small marina in the Berth Area south of the fast land . . . to be used in conjunction with LESSEE's gaming operation. Before commencing construction of said marina, LESSEE must obtain LESSOR's written approval of the size and location thereof, and must obtain all appropriate and necessary permits or approvals therefor. LESSOR shall have the right, as provided in paragraph (2) of this Article, to approve the plans and specifications of the marina.

Through this amendment, the Port Authority granted Gulfside the right to construct a marina on its leased premises, subject only to the Port Authority's approval of plans and specifications for such construction. An analogous grant of authority to construct a hotel is conspicuously absent from the article XII "IMPROVEMENT BY LESSEE" amendment and article IV "TERM" amendment. Such absence must be read to evince a different intent. Gulfside contends that the entertainment complex requirement was not only deleted, but was replaced with a requirement to construct a hotel on the leased premises. On the contrary, if Gulfside had a right and was obligated to build a hotel, then such authority should have been reflected within the four corners of the contract.

¶40. We therefore agree with the chancellor's finding that the extrinsic evidence tendered by Gulfside was immaterial and that the Port Authority was under no obligation to approve Gulfside's plans for hotel construction on the leased premises.

¶41. Assuming arguendo that Gulfside had a right to construct a hotel on the leased premises, subject only to the Port Authority's approval of Gulfside's plans and specifications for such construction, the issue would thus become whether the Port Authority acted reasonably in denying Gulfside's request.

¶42. In *Castle v. McKnight*, 116 N.M. 595, 866 P.2d 323 (1993), the agreement provided that "one party will not change the location of the boundary line fences . . . without the express written consent of the other party." *Id.* at 324. The trial court in *Castle* held that the boundary line agreement placed no limitation on the refusal to consent to relocation of the fence. On appeal, the New Mexico Supreme Court reversed and held that "[t]he consent clause contains an implied covenant of reasonableness." *Id.* at 326.

¶43. Other courts have held the same. *See, e.g., Bayou Land Co. v. Talley*, 924 P.2d 136, 154 (Colo. 1996) ("we have implied the duty of good faith and fair dealing when one party has discretionary authority to determine certain terms of the contract."); *Warner v. Konover*, 210 Conn. 150, 553 A.2d 1138, 1140-41 (1989) ("[a]ccordingly, we hold that a landlord who contractually retains the discretion to withhold its consent to the assignment of a tenant's lease must exercise that discretion in a manner consistent with good faith and fair dealing.").

¶44. By letter dated June, 1994, Gulfside asked the Port Authority for approval to construct a hotel on the leased premises. On July 27, 1994, Blakeslee responded to Gulfside's request stating, "Until the master plan for Port development is adopted, it is premature to determine the best location for such a facility."

¶45. Vickerman, Zachery & Miller ("VZM") was retained by the Port Authority in October, 1993, to prepare a strategic master plan for the Port Authority. The plan was intended to serve the Port Authority in making strategic decisions as to infrastructure, clients, opportunities, diversification and operations.

¶46. After reviewing and adopting the VZM strategic plan, the Port Authority, at an October 26, 1994, meeting, considered the following motion:

Gulfside Casino Partnership previously made a presentation to us related to various proposed

development to its leasehold interest. There was a great deal of confusion and lack of detail regarding the elements of the proposal. We directed numerous questions to Gulfside regarding the proposal and outlined the necessary information required to be furnished to the Staff and the Authority in order to allow the Authority to act. Gulfside, through its recent correspondence, has emphasized the need for the Authority to act on the proposal to construct a hotel on the leasehold interest.

Even though Gulfside has failed to respond to our request for the necessary data regarding the hotel the Authority is of the opinion that a hotel on the leasehold interest would not be in the best short or long term interest of the Port, especially considering the adoption of the Master Plan for the development of the Port.

The motion was passed with four commissioners in favor and one abstaining. On October 31, 1994, Blakeslee sent a letter to Cladianos stating that "the construction of a hotel on Gulfside's leasehold interest would not be in the best short or long term interest of the Port."

¶47. Blakeslee, President of the Board at the time of the meeting on October 26, 1994, testified that the commissioners thoroughly discussed what effect the strategic plan would have on Gulfside's requested plans for development of its leasehold. Although Blakeslee testified that he did not recall seeing the hotel plans submitted by Gulfside, he explained that the basis for denying the right to construct a hotel was that there was only limited land area at the Port, and, based upon the projected growth from the VZM study, the property might be needed for maritime activities.[2] Pursuant to Paragraph XV of the original lease, the Port could have reacquired the property in October, 1999, for maritime expansion. Blakeslee further testified that the Board decided it would not be fair to Gulfside or in the best interest of the State Port to allow a hotel to be constructed which had no value to maritime use of the Port, especially where the property might be needed in the near future for maritime activities. Further, Blakeslee testified that had the hotel been constructed, and the lease were terminated in October, 1999, pursuant to article XV, the entire cost of the hotel, under the contract terms, would be deemed fully depreciated. In that event, Gulfside would have lost a substantial investment. Gulfside was also aware of the Port's public mission statement which was codified in the contract under article II: "It is recognized and acknowledged that the business of the Port is commerce and shipping; and any use by the LESSEE of all or any operations of the Port or its other users, it being agreed that the continued operations of the Port is to have precedence."

¶48. The Board did give Gulfside the opportunity to resubmit the hotel plans in August, 1995, but requested that Gulfside consider alternatives for a hotel within the City of Gulfport or along Highway 90, which was a contingency provided by the second amendment. This proposal was rejected by Gulfside. After reconsidering Gulfside's plans to construct a hotel on its leased premises, the Board reaffirmed its decision.

¶49. In the instant case, this Court will not and cannot expound at length on what would constitute a reasonable refusal, in light of the "plans and specifications" approval requirement, to Gulfside's plan to construct a hotel on its leased premises, as such is highly factually driven. We should, however, point out that a legitimate example of a reasonable objection could be unsuitability or incompatibility of the intended use of the leasehold, especially here where the Port Authority is vested with the public policy responsibility for promoting and developing the use of Port property. *See* Miss. Code Ann. §§ 59-5-1, 59-5-3, 59-5-7, 59-5-11, & 59-5-35 (1996). Thus, considering (1) Blakeslee's weighty testimony; (2) the Port Authority's willingness to consider hotel construction in the city of Gulfport; and (3) the public policy vested in the Port Authority, the Port Authority's denial of Gulfside's request to construct a hotel on the leased premises was

reasonable. Therefore, even if Gulfside had a right to construct a hotel on the leased premises, subject only to the Port Authority's approval of the plans and specifications, we still affirm the chancellor's ruling because the Port Authority did not breach the lease in denying Gulfside's planned hotel constuction, as there was a reasonable basis for its refusal.

¶50. Gulfside also argues that it spent considerable funds in acquiring the leasehold interests of two other Port tenants at the Horseshoe, the Center of International Seamen and Truckers, Inc. and I.T.O. Corporation, in reliance on future plans to construct a hotel. However, the record reveals that the Horseshoe location, including the leaseholds of the other two tenants, was acquired primarily so that Gulfside could relocate away from its original location where a Duratex warehouse was going to be constructed and move to what Cladianos described as a "much better location" since the Port had indicated that if Gulfside moved to the Horseshoe location it would never have to move again. Cladianos could point to no written evidence -- Port Authority minutes or correspondence -- showing any discussion between Gulfside and the Port Authority of Gulfside's plans to build a hotel at the Horseshoe location prior to the execution of the second amendment. According to Cladianos, there were financial problems in connection with partners refusing to finance improvements to the Horseshoe that had to be resolved before thinking about financing or building a hotel. In consideration for Gulfside acquiring the leasehold interest of the other two Horseshoe tenants, the primary term of Gulfside's lease was extended to seven years. Indeed, the chancellor found that "the Copa [had] failed to prove the Port induced the Copa to move to the Horseshoe with any representation that a hotel could be constructed there."

### B. The substitute barge

¶51. After the Port Authority's decision to reaffirm the denial of Gulfside's plan to construct a hotel, Gulfside requested the right to substitute two different barges for the Copa vessel. The MDECD denied those requests by letter dated November 29, 1995.

¶52. In addition to the "approval clauses" found in articles XII (2) and V(8), the lease contained the following provision under article V, entitled "PRE-CONDITIONS FOR LESSEE OPERATIONS":

Prior to commencing operations of dockside gaming activities permitted and authorized by the Mississippi Gaming Control Act of 1990, the following provisions must be met:

LESSOR must preapprove in writing any Vessel which LESSEE proposed to locate and operate on the Leased Premises. If prior approval is not obtained, LESSEE shall not be allowed to permanently dock and will be required immediately to remove the vessel at its expense. LESSORS may at its discretion, at LESSEE's expense, remove any unapproved Vessel located at the Port by LESSEE. If prior approval is not obtained, the Lease shall automatically terminate as provided for hereunder.

¶53. The chancellor found that the Port Authority had no obligation to consent to the substitution of a barge for the Copa vessel. We agree.

¶54. As emphasized above, this Court will look at the instrument as a whole, and its meaning will be determined from the entire agreement as written. In examining the entire lease agreement, we find no provision in the lease which gives Gulfside the right to substitute a barge for the pre-approved gaming vessel. In fact, as the Port Authority points out, Gulfside did not point to any evidence, extrinsic or otherwise, that indicates that Gulfside and the Port Authority ever contemplated the substitution of a barge

for the Copa vessel after the vessel was pre-approved and gaming operations had begun.

¶55. The Court's review of the language of the entire agreement as well as a review of the reasonableness of Gulfside's actions satisfies both the inquiry under the express terms of the contract and under the implied covenant of good faith and fair dealing. We accordingly affirm the chancellor's denial of Gulfside's counterclaim for breach of contract and breach of implied covenant of good faith and fair dealing.

<u>**Cross-Appeal**</u>

**I. WHETHER THE COURT ERRED IN DENYING DECLARATORY JUDGMENT AND SPECIFIC PERFORMANCE THAT THE PORT AUTHORITY HAS EFFECTIVELY EXERCISED ITS RIGHT OF CANCELLATION PURSUANT TO ARTICLE XV OF THE ORIGINAL LEASE.**

**II. WHETHER THE COURT ERRED IN DENYING DECLARATORY JUDGMENT THAT THE PORT AUTHORITY HAD USED ITS BEST EFFORTS, PURSUANT TO ARTICLE XV OF THE LEASE, IN OBTAINING PROPERTY ON THE PORT FACILITY FOR RELOCATION OF GULFSIDE'S OPERATION.**

¶56. The pertinent term and cancellation provisions of the lease are as follows:

The term of this Lease ("Term") shall be (7) years.

If the LESSEE has complied with all the terms, covenants and conditions of this Lease, as of the expiration of the Primary Term, the LESSEE shall have the option to extend the Lease for three renewal periods of five (5) years under the same terms and provisions of the Lease . . .

Third lease amendment, article IV.

\* \* \*

LESSOR shall have the right to cancel this Lease at any time after the expiration of the Primary Term of this Lease for reason of Port expansion of its own facilities to handle expanded shipping and related commerce activities, unrelated to any business or enterprise which may compete with LESSEE's operations . . . .

\* \* \*

Should it be necessary for the LESSOR to exercise its right under this Article, LESSOR shall use its best efforts to aid LESSEE in obtaining property on the Port facility for the relocation of LESSEE's operation, and LESSEE shall have the right of first refusal for any available location on LESSOR's premises which LESSOR determines does not interfere with normal Port operations.

Original lease, article XV.¶57. On July 3, 1996, the Port Authority gave notice of its intent to cancel Gulfside's lease upon the expiration of the primary term of the lease. The letter incorporated the language required by the lease that the premises was needed for port expansion to handle expanded shipping and related commercial activities.

¶58. The chancellor found the cancellation provision to be ambiguous, resorted to parol evidence, and

interpreted it as follows:

> The court finds the purpose of the cancellation provision was to give the Port the right to terminate a lease or relocate a tenant **only** if the Port actually had a specific, immediate and real maritime need for the Copa Leased Premises as a result of expanded shipping and related commerce activities.

¶59. The chancellor based his interpretation on Edwards' testimony that at the time the original lease was negotiated, he told Gulfside's attorney that the cancellation provision would be enforced only "if [the Port] actually had that opportunity in hand, and not speculative."

¶60. In its cross-appeal, the Port Authority argues that the chancellor incorrectly interpreted the cancellation provision by erroneously concluding that the language is ambiguous and subject to explanation with extrinsic evidence. However, regardless of whether the cancellation provision is ambiguous, we find that the chancellor's interpretation was correct. Therefore, to the extent that his consideration of the extrinsic evidence was error, if any, such error was harmless. *See* Miss. R. Civ. P. 61 (disregard errors which do not affect the substantial rights of the parties); Miss. R. Evid. 103(a) (no reversal unless evidentiary error affects "a substantial right of the party."). *See also* **Lacy v. State**, 629 So. 2d 591, 594 (Miss. 1993) ("Parties are bound by what they promise in writing. But we are not bound to adopt a construction not compelled by the instrument in which we would have to believe no man in his right mind would have agreed to."); **Frazier v. Northeast Miss. Shopping Ctr., Inc.**, 458 So. 2d 1051, 1054 (Miss. 1984) ("A construction leading to an absurd, harsh or unreasonable result in a contract should be avoided, unless the terms are express and free of doubt.").

¶61. The Port Authority suggests that article XV should be interpreted to allow cancellation of the lease without any "real" or "specific" need as a result of expanded shipping and commerce activities. This interpretation is unreasonable. As Gulfside contends, any interpretation allowing only a "possible" need would effectively give the Port Authority a unilateral right to terminate the lease for any reason after the primary term. The Port Authority's interpretation would lead to a harsh and impractical result, something this Court does not allow. *See* **Lehman-Roberts v. State Highway Comm'n,** 673 So. 2d 742, 744 (Miss. 1996) ("Where there is a dispute as to the meaning of a contract clause, a party's interpretation must be reasonable to warrant adoption." ); *see also* **Yazoo Mfg. Co. v. Lowe's Companies, Inc.**, 976 F. Supp 430, 436 (S.D. Miss. 1997).

¶62. Given the chancellor's interpretation, we agree that the Port Authority failed to prove that the lease was canceled because of Port expansion to handle expanded shipping and related commerce activities. "This Court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." **Bell v. Parker**, 563 So. 2d 594, 596-97 (Miss. 1990). As Gulfside notes, the most compelling evidence demonstrating the Port Authority's lack of proof came from Jimmy Heidel's testimony. Heidel, Executive Director of the MDECD at that time, was unable to state any specific, real need for the use of Gulfside's leasehold, testifying as follows:

> Q. I want to know specifically what was going to be done on that Copa property . . . in November of 1995.

> A. I can't tell you anything specific that was going to go on the Copa property at that date and time in 1995.

Q. Let's move to the Summer of 1996 when you gave the termination notice to Copa. What specific and existing need did the Port have for that property? . . .

A. I can't say that there was anything right then.

¶63. As the trial court found, no existing tenant of the Port had stated an immediate and real need for the Copa property for any purpose, other than ITO's desire to *continue* to place its equipment on a portion of Copa's parking lot. Furthermore, no potential customer had specifically proposed to use the Copa property for shipping or related commerce activities. The record is devoid of any evidence showing a specific, immediate and real maritime need which would require use of Gulfside's leasehold. All of the evidence offered by the Port Authority was either speculative or what the chancellor described as a "rethinking" of the facility's use to accommodate the commerce that existed when the second lease amendment was executed.

¶64. This Court cannot say that the chancellor was manifestly wrong in finding the Port Authority had failed to prove any specific, existing use for the Copa property which would be a sufficient basis for canceling the lease under article XV. Accordingly, we affirm the chancellor's denial of the Port Authority's request for a declaratory judgment that the lease was effectively canceled.

¶65. The chancellor held that "[s]ince the court declared the Port's cancellation of the lease ineffective, the subject of the alternative site offer is no longer an actual issue in controversy." Affirming the chancellor's ruling denying the requested declaratory relief, we too find moot the issue of best efforts for relocation of Gulfside's operations in case of cancellation of the lease under article XV.

## CONCLUSION

¶66. For the stated reasons, we find no reversible error in the chancellor's rulings (1) that the MDECD and the Port Authority did not violate the lease by denying Gulfside the right to construct a hotel on its leased premises or substitute a barge for the Copa vessel; (2) denying the Port Authority declaratory relief that the lease was effectively canceled; and (3) denying Gulfside's counterclaim for breach of contract and breach of the implied covenant of good faith and fair dealing. Therefore, we affirm the judgment of the Harrison County Chancery Court.

¶67. **AFFIRMED.**

**PRATHER, C.J., PITTMAN, P.J., MILLS AND COBB, JJ., CONCUR. BANKS, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, J. McRAE, J., JOINS IN PART. DIAZ, J., NOT PARTICIPATING.**

**BANKS, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶68. I concur except as to the majority's affirmance on the substitute barge approval issue. Because I can discern no meaningful distinction between the right to approve the barge to be used and the right to approve the hotel particulars, it is my view that a reasonableness test should be applied to both. Accordingly, I would reverse in part and remand this matter for further proceedings with respect to the decision to disapprove the substitute barge.

**SMITH, J., JOINS THIS OPINION. McRAE, J., JOINS IN PART.**

1. The chancellor's decision as to the claims of misrepresentation and breach of the covenant of quiet enjoyment are not issues before this Court.

2. Unlike an administrative agency appeal, the instant action is for breach of contract and therefore it is proper for a reviewing court to rely on Blakeslee's testimony regarding matters considered by the Board but not fully disclosed on the administrative record in determining the reasonableness of the Port Authority's action.